UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

In re:                                                                                Chapter 7
                                                                                       Case No. 11-78278-reg
KEITH BUB a/k/a KEITH L. BUB,

                                   Debtor.
----------------------------------------------------------------x


ROCKSTONE CAPITAL, LLC,


                                   Plaintiff,                                    Adv. Proc. No. 12-8128-reg


against


KEITH BUB a/k/a KEITH L. BUB,


                                   Defendant.


----------------------------------------------------------------x


## MEMORANDUM DECISION
## DENYING THE DEBTOR'S DISCHARGE

This matter is before the Court pursuant to an adversary proceeding commenced by

Rockstone Capital, LLC (the "Plaintiff") against Keith Bub (the "Debtor" or the "Defendant")

seeking to deny the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(A).  The Plaintiff,

which is the Debtor's largest creditor, has attempted without success to collect on a prepetition

judgment against the Debtor for the last several years.  It is undisputed that prepetition, the

Debtor transferred three valuable vehicles from his name into his young son's name, that he

transferred his 1/3 interest in real property to an LLC owned by the Debtor.  Debtor also admits

that after he transferred the three vehicles to his son, he pledged the three vehicles as collateral to secure the debt of another wholly owned business of the Debtor.  However, just prior to filing the petition, the Debtor transferred the vehicles back into his name and listed the three vehicles as assets of his bankruptcy estate.  The Plaintiff seeks to have the Debtor's discharge denied under 11 U.S.C. § 727(a)(4)(A) based on false statements made by the Debtor in the petition, schedules and statement of financial affairs. First, the Plaintiff claims that the Debtor falsely listed an ownership interest in the vehicles as of the date the petition was filed because the transfer of ownership from his minor son was not completed until post-petition.  Second, the Debtor provided false and fraudulent values for the three vehicles in his schedules and falsely claimed a vehicle exemption in one of the vehicles in the hopes of buying one of the vehicles back from the estate for far less than it was actually worth.  Third, the Plaintiff  alleges that the Debtor falsely and fraudulently overstated his expenses and understated his income.  The Plaintiff asserts that these false oaths were made in order to deceive the creditors and the Court regarding the Debtor's true financial condition.

At trial, the Plaintiff placed great emphasis on the causes of action regarding the three vehicles to show a violation under 11 U.S.C. § 727(a)(4)(A). However, because the Debtor's statements regarding the three vehicles were neither false nor fraudulent, this argument must fail. Conversely, the causes of action regarding the false and misleading representations in the Debtor's petition and schedules relative to his income and expenses, which were the subject of minimal discussion during the trial but are fully set forth in the evidentiary record, do present a clear basis for the denial of the Debtor's discharge.   The Court has reviewed the entire record of this adversary proceeding, including the voluminous exhibits submitted by the Debtor at trial. As a result of the misstatements, including the Debtor's failure to disclose all of the income he

derived from his wholly owned business, the Debtor's monthly income was understated by at least $1,800.00. The Debtor accomplished this by falsely representing in the statement of financial affairs that he used a personal credit card solely for business expenses, when in fact this credit card was used for business and personal expenses. The Debtor's explanation that he relied on his accountant's calculations to prepare Schedules I and J does not support his defense. Neither the total amount of income listed, nor the individual expenditures themselves, bear any relationship to the Debtor's actual income and expenses, based on the Debtor's own financial records. Furthermore, the Debtor's explanation that he and his solely owned business are one and the same, so he had the right to run his personal expenses through the bank account for the business, does not absolve the Debtor in this case. Regardless of whether he used his solely owned business as his personal piggy bank, it is the Debtor's failure to include as income all of the funds he took from this business for his own personal benefit, the fact that the Debtor's listed income and expenses are not supported by the documentary evidence, along with his misrepresentation in the petition that the Debtor's business had no assets, that warrant denial of the Debtor's discharge. Based on the foregoing, the Debtor's discharge is denied pursuant to 11 U.S.C. § 727(a)(4)(A).

## PROCEDURAL HISTORY

On November 22, 2011 (the "Petition Date), the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code, and listed it as a no-asset case. Kenneth Kirschenbaum, Esq. was appointed as trustee of the case ("Trustee"). The first meeting of creditors was held on December 21, 2011, and adjourned to January 10, 2012. On December 22, 2011, the Trustee filed a notice of discovery of assets in the Debtor's case. On April 19, 2012, the Plaintiff filed the complaint. On May 23, 2012, the Debtor filed an answer with a counterclaim seeking

sanctions against the Plaintiff pursuant to Fed. R. Bankr. P. 9011.   On June 6, 2012, the Plaintiff

filed a reply to the counterclaim.  On November 7, 2012, a final pretrial order was entered fixing

a trial date of February 12, 2013.  On February 4, 2013, the parties filed a joint pretrial

memorandum. According to the joint pretrial memorandum, the Plaintiff  withdrew the sixth

cause of action seeking to deny the Debtor's discharge pursuant to Bankruptcy Code § 727(a)(5),

leaving the first through fifth causes of action seeking to deny the Debtor's discharge pursuant to

Bankruptcy Code §  727(a)(4)(A).  A trial on the remaining five causes of action was held on

February 12, 2013, and all of the exhibits of the Plaintiff and the Defendant were admitted into

the record without objection.  Upon conclusion of trial, the matter was marked submitted.

## FACTS

The Plaintiff is a creditor of the Debtor pursuant to a judgment entered in New York State

Supreme Court, Suffolk County on May 27, 2009, in the amount of $632,466.80.  The debt arose

in connection with a loan made by the Plaintiff to one of the Debtor's former businesses, which

loan the Debtor had guaranteed.  The Debtor owned and operated several businesses over his

professional career related to computer consulting for small businesses.  Transcript of trial,

February 27, 2013 ("Trial Tr."), p. 41 – 43.   As of the Petition Date, the Debtor's sole source of

income is derived from The Storage Guys, Inc. ("The Storage Guys"), of which he owns 100%

of the shares.  The Storage Guys is a computer consulting business.

According to Schedule B of the petition, the Debtor owned three Dodge Viper

automobiles as of the Petition Date: a 2003 model with a listed valued of $34,691.00, a 1996

model with a listed value of $17,339.00, and a 1994 model with a listed value of $13,359.00

(collectively, the "Vipers").  In Schedule C of the petition, the Debtor claimed an exemption in

the 1996 Viper in the aggregate amount of $15,230.56.   The Debtor listed the Vipers as

encumbered by a judgment lien held by Jaylyn Sales, Inc. ("Jaylyn") in the amount of $195,000,

which lien was listed as "disputed."  Post-petition, the Debtor amended Schedule D to reflect that

Jaylyn only had a disputed warehouseman's lien on the Vipers in the amount of $2,086.91, and

the reference to the $195,000 judgment lien was deleted from Schedule D.

On Schedule B, the Debtor listed a 100% ownership interest in County Road 32 LLC,

with an "unknown" value.  County Road 32 LLC is the 1/3 owner of a condominium

("Gainesville Condo") in Gainesville, Florida.[1]  The Debtor also disclosed on Schedule D that he

is obligated to Wells Fargo Home Mortgage in the amount of $124,472.40.  The Wells Fargo

obligation is secured by a mortgage on the Gainesville Condo, which property the Debtor values

at $100,000.[2]  The Debtor's older daughter and her fiancé live at the Gainesville Condo, and do

not pay rent.  On Schedule J of the petition, the Debtor listed a rent or home mortgage payment

expense in the amount of $550.00 per month.  The Debtor also listed an expense in the monthly

amount of $135.00 for the Gainesville Condo maintenance fee.

On Schedule B of the petition, the Debtor listed his 100% stock interest in The Storage

Guys.  In the petition, the Debtor described the Storage Guys as having no assets, and valued his

stock interest at $0.  In the Statement of Financial Affairs, the Debtor listed a credit card, which

he claimed was used solely for business expenses, and was paid by The Storage Guys directly.

On Schedule I of the petition, the Debtor listed monthly income in the amount of

$3,837.24, which is generated from his employment by The Storage Guys, and listed a monthly

contribution towards household expenses in the amount of $1,100 from Susan Lane, the Debtor's

current girlfriend, with whom he lives.  The Debtor also listed a monthly health insurance

---

[1] The Gainesville Condo is jointly owned by Country Road 32, LLC, Barbara Anzalone  (the Debtor's first wife) and Joshua Bub, the Debtor's adult son from his first marriage.

[2] Although the Debtor no longer had an ownership interest in the Gainesville Condo, which secures the obligation to Wells Fargo Home Mortgage, the Debtor, along with Barbara Anzalone, are obligors on the note.

expense in the amount of $661.00, and a monthly electricity and heating expense in the amount of $385.00.

***The Vipers***

At trial, the Debtor testified that the 1996 Viper was purchased new for $72,157.16. Trial Tr., p. 89. In December, 2007, the Debtor transferred the Vipers into his son's name, who was one at the time. Trial Tr., p. 55 – 56. The Debtor testified that he was in the midst of a divorce in 2007, and he transferred the Vipers to his one year old son upon the advice of his divorce attorney. In 2008, when the Debtor no longer had title to the Vipers, the Debtor obtained insurance for the Vipers for an aggregate value of $140,000. (Plaintiff's Ex. 5). The 1996 Viper was valued at $50,000 according to the 2008 auto insurance policy. (Plaintiff's Ex. 5). On December 12, 2007, notwithstanding the fact that the Debtor no longer owned the Vipers, the Debtor pledged the Vipers as collateral for a loan made by Jaylyn to The Storage Guys in the amount of $195,000. (Plaintiff's Ex. 13). The loan was memorialized in a written note. (Plaintiff's Ex. 13). The security interest granted to Jaylyn in the Vipers was never perfected because it was never noted on the certificates of title to any of the Vipers. However, Jaylyn did retain possession of the certificates of title to the Vipers. Trial Tr., p. 70. The Debtor testified that he used approximately $110,000 of the loan proceeds to pay his obligations under the divorce settlement with his ex-wife, and the remainder was retained for use by The Storage Guys. Trial Tr., p. 62. On November 10, 2011, title to the Vipers was transferred from the Debtor's son back to the Debtor. Trial Tr., p. 72. (Plaintiff's Ex. 18). The Debtor received the titles for the Vehicles from the Department of Motor Vehicles on December 1, 2011.

During his testimony, the Debtor admitted that he failed to disclose his transfer of the Vipers to his son in a deposition conducted prepetition. According to the Debtor, he did not

consider the transfer of the Vipers to his son to fall within the definition of "disposing of" these assets.  Trial Tr., p. 84-85.

Prior to listing the value of the Vipers in Schedule B of the petition, the Debtor consulted the Edmunds website and the Kelley Blue Book website to determine the value of the Vipers. The Edmunds website listed a value range for the 1996 Viper at $17,339.00 as a trade-in, and $19,409.00 for a private party sale.  (Plaintiff's Ex. 21).  The Kelley Blue Book website listed a value range of $36,636.00 to $39,386.00 for a private party sale, depending on the condition of the vehicle.  (Plaintiff's Ex. 22).  The Debtor testified that he gave his attorney the information from both websites.  Trial Tr., p. 103-104.  The Debtor also acknowledged that in response to the Plaintiff's request for information on the value of the Vipers, counsel to the Debtor submitted a letter to counsel to the Plaintiff, indicating that the 1996 Viper had a value of $17,339.00 pursuant to the Edmunds website, and that the Kelley Blue Book did not provide valuations for the Vipers.  (Defendant's Ex. A). Trial Tr., p. 101.  The Debtor had no explanation for why the letter contained the incorrect reference to the Kelley Blue Book valuations.  According to the Debtor, he had no expectation that the Trustee would accept the value the Debtor ascribed to any of the assets listed in the petition.  Trial Tr., p. 134.  The Debtor also acknowledged that contrary to the information on the petition as originally filed, Jaylyn never sued the Debtor and had no judgment against the Debtor for moneys owed on the loan between Jaylyn and The Storage Guys.  Trial Tr., p. 122.  The Debtor made an offer to the Trustee to purchase the estate's interest in the 1996 Viper for $1500 plus waiver of the claimed exemption, which offer was rejected. The Trustee eventually sold the Vipers for the aggregate price of $103,500.00.  The purchase price for the 1996 Viper was $37,900.00.

**The Gainesville Condo Expenses**

In Schedule J of the petition, the Debtor listed an expense in the amount of $550.00 under the category of "rent" or a "home mortgage payment". The Debtor admitted at trial that this was not a rental or mortgage expense he incurred, but claimed it was his monthly contribution towards a mortgage obligation due on the Gainesville Condo. Trial Tr., p. 112. The Debtor's daughter and her fiancé live in the Gainesville Condo, and the Debtor testified that he made the payments in lieu of repaying arrears owed in connection with unpaid child support. Trial Tr., p. 113. The Debtor testified that he stopped making these payments around the time the petition was filed because he could no longer afford to make them. Trial Tr., p. 120. The Debtor has not amended Schedule J to correct the nature of this expense, or deleted it as an expense because he has not paid since the Petition Date. The Debtor did not introduce any exhibits to support his contention that the payments were made in lieu of a valid unpaid support obligation. In fact, there is no documentary evidence to support a monthly rental or mortgage expense in this amount.

The bank records of the Debtor and his business, The Storage Guys, reflect that for approximately one year prior to the Petition Date, monthly transfers in the amount of $1,100.00 were made from the TD Bank account ending in numbers 7986 maintained in the name of The Storage Guys ("The Storage Guys Bank Account") to the Debtor's personal bank account held at TD Bank, ending in numbers 8009 ("Debtor Bank Account") each month. (Defendant's Ex. E). Each month, an electronic payment in the amount of $1,093.97 was made from the Debtor Bank Account to Wells Fargo Home Mortgage, which is the mortgagee of the Gainesville Condo property. (Defendant's Exs. A, E). Neither the Debtor Bank Account nor The Storage Guys Bank Account reflect a monthly payment or debit in the amount of $550.00. This documentary evidence contradicts the Debtor's testimony and supports the conclusion that the Debtor was

paying the entire monthly mortgage on the Gainesville Condo with funds generated from The Storage Guys for the entire year prior to the Petition Date.

***The Storage Guys***

At trial, the Debtor testified that he listed his 100% stock ownership in The Storage Guys in the petition and valued the stock at $0 on Schedule B.  He added the words "no assets" to this disclosure because as of the Petition Date, The Storage Guys had no "net" assets.  Trial Tr., p. 110, 111.  The Debtor came to this conclusion by averaging the debts of The Storage Guys with the amount of funds in The Storage Guys Bank Account.  The Storage Guys was indebted to Chase Manhattan Bank in the approximate amount of $19,000 as of the Petition Date.  The Debtor had personally guaranteed the obligation to Chase Manhattan Bank, and listed this debt in Schedule F of the petition.  Trial Tr., p. 153.  The Debtor also acknowledged that as of the Petition Date, The Storage Guys Bank Account reflected a balance of approximately $19,000.00.  Trial Tr., p. 110.

 According to no. 3 to the Debtor's Statement of Financial Affairs, the Debtor listed a Chase (Southwest.com) credit card ("Chase Southwest Card") in his name, and disclosed that $15,516.54 in payments were made to the Chase Southwest Card account over the 90 days prior to the Petition Date.  According to the notes in the Statement of Financial Affairs, the payments were made "with funds from business, for business debts."

Contrary to the notes in the Statement of Financial Affairs regarding the nature of the charges, the exhibits produced by the Debtor at trial reflect that a significant number of the charges were for personal items.  (Defendant's Ex. A).  For example, each month, there is a recurring charge in the amount of $500.00 for an entity named "Natural Image Long Island," which is an expense for personal grooming, and numerous charges from supermarkets,

pharmacies, dry cleaning establishments and other retail stores unrelated to the business of The Storage Guys.  (Defendant's Ex. A).  Based on an informal and conservative review of the expenses charged on the Chase Southwest Card for the ninety days prior to the Petition Date, an average of $2594.00 per month was charged for personal items unrelated to the business of The Storage Guys.  (Defendant's Ex. A).[3]  The Debtor is correct that the charges for the Chase Southwest Card were paid from The Storage Guys bank account.

At various times, the Debtor testified at trial that he believed he was one and the same as The Storage Guys, and that The Storage Guys paid the Debtor's personal expenses in lieu of salary:

Q.  Okay.  So when the company pays the electric bill, you sort of think that's yourself paying it because you are the company?

A.  Correct.

Trial Tr., p. 119.


Q.  Okay.  It's true though, is it not sir, that your company, The Storage Guys, in fact paid that electric bill?

A. Yes.

Q. So the statement, at least insofar as the portion that's attributable to electric is that you're paying this as an individual expense is incorrect, because it's paid by your company?

A.  Well, since I'm the one hundred percent shareholder in my company, it is my company.  And when I need money to pay bills that's what I use. Because I don't take a salary.

Trial Tr., p. 116.

---

[3] This estimate of charges solely for the personal benefit of the Debtor does not include significant charges for goods or services provided by Direct Marine Fuel.  While the Debtor did not testify regarding the nature of this expense, it does not appear to be a legitimate business expense.

When discussing the $195,000 loan from Jaylyn to The Storage Guys, and explaining why the

Debtor pledged The Vipers as collateral for a loan to The Storage Guys, the Debtor testified as

follows:

A. I'm not sure I understand.  I mean I know The Storage Guys took the loan out.  But I am The
Storage Guys, so although I didn't sign any [loan documents in the Debtor's personal capacity],
a personal guarantee or anything I just –

Q. So all the assets of The Storage Guys took are included in your petition as well?

A. Yeah. Whatever is there, yeah.  It was under the business entity, I believe.

Q. Does The Storage Guys earn, generate any money a month?

A. Yeah, they did.  It did.

Q. How much money did they generate a month?

A. I think our sales are like one hundred thousand for the year, so average, a little less than ten

thousand dollars in sales.

Q.  Was that income included in your schedules?

A.  I believe the net.  That was the gross income, not the net.  I mean, the net is in there.

Trial Tr., p. 141.

***Income and Expenses***

As set forth above, the Debtor testified that the electric bill for his residence is paid by

The Storage Guys.  The Storage Guys Bank Account statements reflect monthly debits for the

Debtor's home electricity bill, in amounts varying from $125.33 to $261.21.  (Plaintiff's Ex. 6).

The Debtor also acknowledged that his monthly health insurance in the amount of $661.00 is

paid from The Storage Guys Bank Account.  Trial Tr., p. 120.  The Debtor listed both of these

items as expenses he paid from his monthly income listed in the amount of $3,837.24 on

Schedule I.  According to the Debtor's testimony, the Debtor's monthly income listed in

Schedule I included these expenses paid by The Storage Guys.  Trial Tr., p. 190.   The Debtor explained that his monthly income was calculated by his accountant, based on the transfers made by The Storage Guys to the Debtor, and on behalf of the Debtor.   Trial Tr., p. 190.

The Debtor testified that his accountant calculated the Debtor's income and expenses over a period of time, based on his books and records, and divided the number by the number of months reviewed, to come up with the amounts listed in the schedules to the petition.  Trial Tr., p. 190.  The Debtor acknowledged that in the two months prior to the Petition Date, The Storage Guys paid $7,500.00 to the Debtor's bankruptcy counsel, and approximately $6,840.00 to the Debtor's son as a wedding gift.  Trial Tr., p. 189 – 190.  The Debtor further testified that he did not know for certain whether these transfers by The Storage Guys were included in the calculations of the Debtor's income made by his accountant.  Trial Tr., p. 190. The bank statements for The Storage Guys Bank Account reveal that during 2011, The Storage Guys transferred $1100.00 per month into the Debtor's personal bank account.  (Plaintiff's Ex. 6).  If this amount were added to the insurance and utility expenses paid by The Storage Guys on behalf of the Debtor, and if the payments made to the Debtor's bankruptcy counsel and to the Debtor's son were amortized over twelve months, the average monthly "salary" the Debtor realized from The Storage Guys would equal $3,060.00.  While this number is not far off from the Debtor's claimed income in Schedule I, this does not include the personal expenses charged on the Chase Southwest Card which averaged $2,594.00 per month at a minimum.  The total of these two numbers far exceed the monthly income listed on the Debtor's Schedule I.  This total also exceeds the annual salary the Debtor listed in question 1 of the Statement of Financial Affairs by over $3,000.00 per month.

## DISCUSSION

***Legal Standard for Denial of Discharge pursuant to 11 U.S.C. § 727(a)(4)(A)***

It is well-settled law that the denial of a debtor's discharge is a drastic remedy that must be construed strictly in favor of the debtor. *State Bank of India v. Chalasani* (*In re Chalasani*), 92 F.3d 1300, 1310 (2d Cir. 1996). "The reasons for denying a discharge to a bankruptcy must be real and substantial, not merely technical and conjectural. *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997). However, a discharge under section 727 is a privilege, not a right, and may only be granted to the honest debtor. *Congress Talcott Corp. v. Sicari* (*In re Sicari*), 187 B.R. 861, 880 (Bankr. S.D.N.Y. 1994). The plaintiff bears the burden of establishing each of the elements of section 727 by a preponderance of the evidence. *See Minsky v. Silverstein* (*In re Silverstein)*, 151 B.R. 657, 660 (Bankr. E.D.N.Y. 1993); *see also* Fed. R. Bankr. P. 4005.

> 11 U.S.C. § 727(a)(4)(A) provides:
> The court shall grant the debtor a discharge, unless –
> (4) the debtor knowingly and fraudulently, in or in connection with the case –
> (A) made a false oath or account.

Under this section, the Plaintiff must prove by a preponderance of the evidence that: (1) the Debtor made a statement under oath; (2) the statement was false; (3) the Debtor knew the statement was false; (4) the Debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Carlucci & Legum v. Murray (In re Murray)*, 249 B.R. 223, 228 (E.D.N.Y. 2000).

A materially false statement made or omitted as part of the bankruptcy petition, schedules, or at an examination or during the proceeding itself may constitute a false statement under oath for purposes of § 727(a)(4)(A). *New World Restaurant Group, Inc. v. Abramov (In re Abramov)*, 329 B.R. 125, 132 (E.D.N.Y. 2005). A debtor's prepetition conduct, even if it caused harm to creditors, cannot give rise to a claim under this subsection. The statute specifies that the

false oaths must be made in or in connection with the debtor's bankruptcy case. *Giasante & Cobb, LLC v. Singh (In re Singh)*, 433 B.R. 139, 156 (Bankr. E.D. Pa. 2010) (The debtor's use of a fictitious address prepetition did not constitute grounds to bar the debtor's discharge, regardless of the harm it caused to creditors of the debtor).

The burden of showing actual fraudulent intent lies with the party objecting to the debtor's discharge. *Pergament v. Smorto* (*In re Smorto*), No. 07-CV-2727 (JFB), 2008 WL 699502, at *4 (E.D.N.Y. Mar. 12, 2008). It is not enough under section 727(a)(4)(A) that a debtor is merely careless in the preparation of documents to be filed with the court, or in his testimony in connection with the case. The omission must rise to the level of showing fraudulent intent. *Painewebber, Inc. v. Gollomp* (*In re Gollomp*), 198 B .R. 433, 437 (S.D.N.Y.1996). . This intent can be proven by either (1) evidence of a debtor's actual intent to deceive or (2) indicia of his reckless indifference to the truth. *Adler v. Lisa Ng and Charming Trading Co*. (*In re Adler*), 395 B.R. 827, 843 (E.D.N.Y. 2008); *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 383 (5th Cir. 2001), *cert. denied*, 534 U.S. 1042 (2001). Proof of "an actual intent to deceive" can come from the familiar badges of fraud which are instances of conduct, such as secreting proceeds, transferring property to family members and concealing relevant facts, that often point to fraud. *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582 (2d Cir. 1983), *Martin v. Key Bank of New York (In re Martin)*, 208 B.R. 799, 806 (N.D.N.Y. 1998) (citing *United States v. Coppola*, 85 F.3d 1015, 1021 (2d Cir. 1996)).

The second means of proving fraudulent intent—"reckless indifference to the truth" or "a cavalier disregard of the truth"—is unique to § 727(a)(4)(A). *Stamat v. Neary*, 635 F.3d 974, 982 (7th Cir. 2011); *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009). To prove intent under this reckless disregard standard, courts consider the following three non-

exclusive factors: (a) "the serious nature of the information sought and the necessary attention to detail and accuracy in answering," *Wisell v. Wisell (In re Wisell)*, No. 2:06-CV-167-WKS, 2007 U.S. Dist. LEXIS 64011, at *8 (D. Vt. Aug. 28, 2007) (internal quotation marks omitted) (citing *Sanderson v. Ptasinski (In re Ptasinski)*, 290 B.R. 16, 22–23 (Bankr. W.D.N.Y. 2003)); (b) a debtor's "lack of financial sophistication" as evidenced by his or her professional background, *Pergament v. Derise (In re Derise)*, No. 07-CV-3083 (JFB), 2008 U.S. Dist. LEXIS 91853, at *27–28 (E.D.N.Y. Mar. 27, 2008); and (c) whether a debtor repeatedly blamed recurrent errors on carelessness or failed to take advantage of an opportunity to clarify or correct inconsistencies, *e.g.*, *Cadle Co. v. Mitchell (In re Mitchell)*, 102 Fed. Appx. 860, 862–63, 863 n.3 (5th Cir. 2004); *Aetna Ins. Co. v. Nazarian (In re Nazarian)*, 18 B.R. 143, 147 (Bankr. D. Md. 1982) ("[N]o carelessness could excuse the Debtor's failure to amend his schedules promptly when he had the leisure to do so.").

Finally, the omissions and/or misstatements by a debtor must be material. However, "any matter bearing on the discovery of estate property or the disposition of the debtor's property is material for purposes of § 727(a)(4)(A)." *New World Restaurant Group, Inc. v. Abramov*, 329 B.R. at 134. The Court of Appeals for the Second Circuit has held that whether the inclusion of the assets would have increased the value of the debtor's estate is not determinative of whether the omission is material. *In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974). "The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious." *Chalik v. Moorefield*, 748 F.2d 616, 618 (citing *Diorio v. Kreisler-Borg Constr. Co.*, 407 F.2d 1330 (2d Cir. 1969)).

"Once the [plaintiff] has produced persuasive evidence of a false statement, the burden shifts to the debtor to come forward with evidence to prove that it was not an intentional misrepresentation or provide some other credible explanation." *See Periera v. Gardner (In re Gardner)*, 384 B.R. 654, 662-63 (Bankr. S.D.N.Y. 2008) (citations omitted). "While the burden of persuasion rests at all times on the creditor objecting to discharge, it is axiomatic that the debtor cannot prevail if he fails to offer credible evidence after the creditor makes a *prima facie* case." *Palmer v. Downey (In re Downey)*, 242 B.R. 5, 14, 15 (Bankr. D. Idaho. 1999) (other citations omitted).

"'Courts may consider the debtor's education, business experience, and reliance on counsel when evaluating the debtor's knowledge of a false statement, but the debtor is not exonerated by pleading that he or she relied on patently improper advice of counsel.'" *Wachovia Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272, 313 (Bankr. E. D. Pa. 2006) (quoting *In re Maletta*, 159 B.R. 108, 112 (Bankr. D. Conn. 1993)). Although the courts do not uniformly endorse the use of this defense for purposes of § 727(a)(4)(A), advice of counsel may sometimes "provide an excuse for an inaccurate or false oath," albeit not a fraudulent one. *Georges v. Georges (In re Georges)*, 138 Fed. Appx. 471, 472 (3d Cir. 2005) (quoting *In re Topper*, 229 F.2d 691, 692 (3d Cir. 1956)). Advice of counsel, however, will not serve as a defense when "it is transparently plain that the property should be scheduled." *Dubrowsky v. Perlbinder* (*In re Dubrowsky*), 244 B.R.560, 573 (E.D.N.Y. 2000). It will also not save a debtor who has failed to produce "the serious information sought" and to show "the attention to detail and accuracy in answering" expected of a similarly situated person. *In re Wisell*, 2007 U.S. Dist. LEXIS 64011 at *8.

*Analysis*

The Plaintiff alleges that the Debtor is not entitled to a discharge due to numerous false oaths in his petition regarding his ownership interest in the Vipers, his valuation of the Vipers, his claimed exemption in the 1996 Viper, the assets of The Storage Guys, and his income and expenses. The Court shall examine each of these allegations in order to determine whether the Plaintiff has made a *prima facie* case, and if so, whether the Debtor's explanations successfully rebutted the Plaintiff's case.

***Second Cause of Action***

Pursuant to the second cause of action, the Plaintiff seeks to bar the Debtor's discharge due to his allegedly false statements regarding ownership of the Vipers as of the Petition Date. According to the Plaintiff, the Debtor falsely claimed he owned the Vipers despite the fact that he had no legal right to transfer the Vipers to himself once a restraining notice was served on the Debtor's girlfriend prepetition.  Whether or not the Plaintiff believes the Debtor had a right to transfer the Vipers back into his name prepetition, the Debtor accurately disclosed his ownership interest in the Vipers as of the Petition Date.  This disclosure was based on the prepetition transfer of the Vipers from the Debtor's son to the Debtor immediately prior to the Petition Date.

Under New York law, an entity is the owner of a motor vehicle upon the submission of an application to the Department of Motor Vehicles for transfer of title.  NYS Vehicle and Traffic Law. §§ 2113 and 2116. (McKinney 2013).  Section 2113(c) provides that transfer of title is completed when "provisions of this section and section [2116] have been complied with." NYS Vehicle and Traffic Law. §§ 2113.  Section 2116 requires that an application for a certificate of title be accompanied by the required fee and delivered to the commissioner of motor vehicles.  The Debtor complied with these provisions prior to the Petition Date.  While the Debtor's conduct in transferring the Vipers to his son prepetition is hardly model conduct,

neither his initial transfer nor the re-transfer are actionable under § 727(a)(4)(A).  The Debtor's

disclosure in the schedules that he owned the Vipers was proper and correctly reflected the facts.

Therefore, the second cause of action is dismissed.

### First Cause of Action

According to the Plaintiff, Debtor falsely claimed a vehicle exemption in the amount of

$15,230.56 in the 1996 Viper despite the fact that he did not use the 1996 Viper for

transportation, he had pledged the 1996 Viper to a creditor, and he did not have possession or

control of the 1996 Viper as of the Petition Date. However, none of these factors are relevant

when determining whether a claimed vehicle exemption is false or fraudulent.  The date of the

petition governs when determining exemptions, and whether the 1996 Viper was in his

possession has no bearing on this issue.[4]

Under the Bankruptcy Code, property of the estate includes "all legal and equitable

interests of the debtor in property *as of the commencement of the case*."  11 U.S.C. § 541(a)(1)

(emphasis added).  As the Court of Appeals for the Second Circuit confirmed, "[t]he Code

broadly defines 'all legal or equitable interests of the debtor in property' at the commencement

of the case as property of the debtor's estate in bankruptcy."  *Regan v. Ross,* 691 F.2d 81, 83 (2d

Cir. 1982).   Thus, the time used to determine what assets are included as property of the estate is

the date the petition is filed.[5]  Once property becomes part of the bankruptcy estate, the debtor

may claim that certain interests in property are exempt from the debtor's estate. 11 U.S.C.  § 522.

*CFCU Community Credit Union v. Hayward*, 552 F.3d 253, 258 (2d Cir. 2009).   Because the

---

[4] There appears to be an outstanding  motion by the Trustee objecting to the Debtor's claimed exemption to the 1996 Viper [dkt 45].  The Trustee's objection is based on issues not raised in this adversary proceeding.  This decision does not affect the Trustee's objections to the Debtor's claimed exemption to the 1996 Viper.

[5] There are exceptions for certain types of property not relevant to this case.  *See* 11 U.S.C. § 541(a)(5).

Debtor was entitled to claim an exemption to the 1996 Viper pursuant to Bankruptcy Code § 522, his conduct was neither false nor fraudulent.

The Plaintiff also asserts that the Debtor's valuation for the 1996 Viper was false and fraudulent.  The valuation is identical to the Edmunds trade-in value for the vehicle, but not the Kelley Blue Book valuation, which is substantially higher.  According to the Plaintiff,  the Debtor's failure to report to the Trustee the Kelley Blue Book valuation for the 1996 Viper, and the Debtor's offer to the Trustee to purchase the 1996 Viper for $1,500.00 plus waiver of his claimed exemption was false and made in bad faith.   The Debtor also falsely represented that there was no Kelley Blue Book valuation for the 1996 Viper, which representation was included in a letter sent by the Debtor's counsel to the Trustee.

With respect to the Debtor's valuation of the 1996 Viper, the Court finds that the failure to factor in the Edmunds valuation was not false or fraudulent.   The Debtor had obtained valuations from two reputable sources, and had used the lower valuation in the Schedules.  The fact that the Edmunds valuation proved to be more accurate than the Kelley Blue Book valuation does not prove the Plaintiff's case.  The Debtor did not "make up" a valuation and it was appropriate to rely on either valuation.  The Debtor's testimony at trial that he turned over both the Edmunds and the Kelley Blue Book valuations for the 1996 Viper is troubling because the Debtor's counsel represented in a letter to the Trustee and at trial that he never received a Kelley Blue Book valuation from the Debtor.  Nonetheless, the 1996 Viper was disclosed in the Schedules and a valuation based on a reputable source was given.  Therefore, the Court does not find that the circumstances surrounding the valuation of the 1996 Viper resulted in a false or fraudulent oath.  Likewise, the Debtor's offer to purchase the 1996 Viper is not actionable under § 727(a)(4)(A).  The offer does not constitute a false statement under oath by the Debtor. As a

result, the first cause of action is dismissed for failure to prove a *prima facie* case under §
727(a)(4)(A).

***Third Cause of Action***

 The third cause of action is based on alleged false statements regarding the Debtor's
estimated monthly expenses.  According to the Plaintiff, the Debtor's inclusion of monthly
mortgage expenses of $550.00 and a condominium maintenance fee in the amount of $135.00
were false as they were not his own living expenses, and he was no longer incurring them as of
the Petition Date.  Further, the Debtor's claimed expense of $385.00 per month for utilities was
false because The Storage Guys actually paid for approximately $200.00 of this expense, and the
Debtor's claimed expense for $661.00 per month for health insurance was false for the same
reason.  As a result, the Debtor's expenses were overstated by an amount in excess of $1,731.00
per month.  The Debtor admits that the claimed mortgage expense in the amount of $550.00 was
not his mortgage expense, nor was the condominium maintenance fee in the amount of $135.00.
According to the Debtor, he made these payments on a monthly basis in lieu of curing arrears
that had accrued in prior support obligations to his first wife.  The information contained in
monthly statements from the Debtor Bank Account does not support the Debtor's representation
because there is no reflection of a monthly debit or withdrawal in the amount of $550.00.  The
statements from the Debtor Bank Account and The Storage Guys Bank Account  reveal that
$1,100.00 was transferred from The Storage Guys Bank Account to the Debtor Bank Account
each month, and an automatic payment was made from the Debtor Bank Account to Wells Fargo
Home Mortgage each month in the amount of $1,093.97.  None of this was disclosed by the
Debtor in his schedules or in his testimony.  The Debtor's explanation that he was helping his
first wife by paying half of the mortgage obligation on the Gainesville Condo where his daughter

lived is false.  As a result of this arrangement, the Debtor was using his personal funds to satisfy the entire monthly mortgage obligation on the Gainesville Condo, which the Debtor no longer owned, but for which the Debtor remained jointly obligated on the note to Wells Fargo Home Mortgage.

The Debtor's motive for understating the "mortgage expense" and the false explanation that it was in lieu of making up arrears on domestic relations obligations is not clear to the Court. However, it is not necessary for the Court to determine why he deceived the Court and the creditors, only to determine whether he has done so. The failure to correctly list this monthly expense is false, and created a false picture of the Debtor's financial circumstances. The only conclusion the Court can draw from this arrangement is that the Debtor intentionally failed to disclose that he was paying the note secured by the mortgage on the Gainesville Condo in full, despite the fact that he no longer held an ownership interest in the Gainesville Condo.  For these reasons, the Debtor has failed to rebut or adequately explain the listing of the $550.00 expense on his schedule.

### Fourth Cause of Action

The Debtor also made false oaths regarding his income.  The Debtor claims his accountant calculated his monthly income at $3,837.24 based on the Debtor's books and records. The Debtor did not receive a periodic salary from The Storage Guys but instead used funds from The Storage Guys bank account to pay his personal expenses.  While using a business bank account to pay personal expenses does not constitute grounds to deny a debtor's discharge, falsely under-representing the amount of funds used for personal expenses does give rise to a claim under § 727(a)(4)(A).  The Debtor falsely represented in the Statement of Financial Affairs that the Chase Southwest Credit Card was used solely for expenses incurred by The Storage

Guys.  As discussed above, the statements for the one year prior to the Petition Date reflect that the Chase Southwest Credit Card contains numerous charges for non-business items, such as personal grooming, dry cleaning, food, and entertainment.  When averaged out over three months prior to the Petition Date, the Debtor used the Chase Southwest Credit Card for his personal expenses in the amount of at least $2594.00 per month.  This amount, when added to the $3,060 per month in income the Debtor averaged based on the monthly mortgage payment, the  monthly expenses paid by The Storage Guys on the Debtor's behalf and the additional expenses for legal fees and gifts, exceeds the claimed monthly income by over $1,800.00 per month.

The Debtor's explanation for the income and expenses listed in Schedule I and J are twofold.  First, the Debtor repeated time and again that he used The Storage Guys Bank Account for his personal expenses because he did not draw a traditional salary.   Second, the Debtor testified that he relied on his accountant to determine his income.  What is missing from these explanations is that the Debtor failed to report as income the expenses he charged on the Chase Southwest Credit Card.  It also does not explain the Debtor's false representation in the Statement of Financial Affairs that the Chase Southwest Credit Card was used solely for business purposes.  As the sole user of this credit card, he is charged with being aware of how this credit card was used, and that many of the items he charged were not related to his business.  The Debtor knew that the income listed in Schedule I was false, and covered it up by making the false representation regarding the use of the Chase Southwest Credit Card.  The Court concludes that these false statements were made with the intent to deceive the creditors and the Court.

When all of these misstatements are pieced together, and the documentary evidence is reviewed, a picture of the Debtor's overall scheme emerges.  The Debtor used his own personal

bank account to pay the mortgage payment for the Gainesville Condo, which he no longer had an ownership interest, and did not use the Debtor Bank Account for many other personal expenses. The Debtor used The Storage Guys Bank Account to fund the mortgage payment, and to pay a few regular monthly personal expenses.  The Debtor also used a credit card to charge the rest of his personal expenses, and paid this card from The Storage Guys Account.  The end result is that the Debtor's testimony that he included all of his income from The Storage Guys in his petition and schedules was false.  It is apparent that the Debtor used The Storage Guys to hide his true income and expenses to deceive the creditors and the Court.  This failure to disclose all of his income for no justifiable purpose warrants denial of the Debtor's discharge.

### Fifth Cause of Action

According to the Plaintiff, the Debtor's listing of the liabilities of The Storage Guys in his petition, and not the $19,000 in the bank account for The Storage Guys, constitutes grounds to deny the Debtor's discharge as well  The Debtor admits to stating in Schedule B that The Storage Guys had no assets.  His explanation for this representation is that because The Storage Guys owed a debt to Chase bank in the approximate amount of $19,000.00, The Storage Guys had no "net assets."  However, this excuse does not ring true.  The Debtor testified at trial that he and The Storage Guys were one and the same.  Therefore, the assets and liabilities of The Storage Guys were his own assets and liabilities. In order to be consistent, the Debtor had to list both, and he did not.  If this were the only questionable statement in the petition, perhaps the Debtor's explanation would persuade the Court to find that the Debtor did not have the requisite intent to deceive the Court.  However, this is one in a series of false statements which, standing together, show a pattern of deceptive behavior on the part of the Debtor.  As courts have recognized, evidence of "a pattern of wrongful behavior" presents a more compelling case of intent to

defraud than does an isolated instance of an omission by a debtor.  *I.R.S. and U.S.T. v. Garland (In re Garland)*, 385 B.R. 280, 295 (Bankr. E.D. Okla. 2008) (citing *Freelife, Internat'l LLC v. Butler (In re Butler),* 377 B.R. 895, 916 (Bankr. D. Utah. 2006) (other citations omitted).  Such is the case with this Debtor.  In addition, the Debtor's testimony was evasive and lacked credibility, as it was contradicted by his own exhibits.  This is not the honest debtor who deserves a fresh start.   As a result of the outcome of this adversary proceeding, the Debtor's counterclaim seeking sanctions against the Plaintiff under Fed. R. Bankr. P. 9011 is dismissed.

## CONCLUSION

Based on the Debtor's false and fraudulent statements regarding his income and expenses, with the intent to deceive the creditors and the Court, the Debtor's discharge is denied pursuant to 11 U.S.C. § 727(a)(4)(A).  Judgment shall be entered in favor of the Plaintiff on the Third, Fourth and Fifth Causes of Action, and the First and Second Causes of Action shall be dismissed.  The Counterclaim shall be dismissed as well.

Dated:  Central Islip, New York
      November 13, 2013                              By:  *__/s/ Robert E. Grossman__*
                                                    Robert E. Grossman
                                                    United States Bankruptcy Judge